Mr. Fierro was brutally beaten by fellow Arizona inmates after not one but six separate requests to be placed in protective custody due to threats and assaults from members of the Border Brothers Gang. Rather than take those requests seriously, defendants here declined to investigate and dismissed each PC request as self-reported and unsubstantiated. By the time of Mr. Fierro's third PC request, Deputy Warden Schuster testified that it was quote crystal clear that Mr. Fierro needed protective custody. Yet that recommendation was overruled by more senior prison officials as were Mr. Fierro's next three requests for protection leading to Mr. Fierro's entirely preventable injuries. Mr. Fierro's attempt to vindicate his rights through an Eighth Amendment failure to protect claim was hampered by the district court in two respects. First through the court's erroneous Norwood jury instruction. A Norwood instruction requires the jury to defer to prison officials in the adoption and execution of security-related policies. But here, no security-related policy was at issue. Each of Mr. Fierro's requests for protection was denied not because of some security-based policy but because the defendants claimed they could not substantiate the threats against Mr. Fierro. In effect, the erroneous Norwood instruction commanded the jury to defer to the defendants on whether Mr. Fierro faced a substantial risk of harm which is not how the instruction should be used according to this court's decision in Shorter. Do you think that the way the instruction should be used should depend on whether it's an individualized determination or a more widespread prison policy like a lockdown of the whole prison? How do you understand how we decide when this instruction should be given? Well, Your Honor, this court's decision in Shorter I think provides the best guidance on that point. And the defendants have to show a connection to a security-based policy. So you do have to have a policy, not just an individual determination. And they have to be implementing that policy with regard to the specific inmate. And here, you don't have either of those factors. No security-based policy was invoked as the reason for denying Mr. Fierro's PC requests. And we know that's the case. And do you think that has to be in real time? I mean, at least after the fact they said, we can't put everyone in protective custody. That would ruin protective custody. We need to make sure dangerous people aren't in protective custody because that would put other people at risk. I mean, there were security issues that were eventually used as explanations. Well, Your Honor, I think it's important to clarify that those explanations did not come until after summary judgment and at trial. So those explanations were never raised during discovery. They only came out at trial from a couple of witnesses who said, yes, in general, we have to limit the number of people in PC. But if you look at the record that was established at the time, none of the denials related to that kind of overcrowding concern. And regulations required the officials denying the PC requests to document the exact reason why they were denying the request. So any of our case law on when this instruction should be given, talk about how the reason has to be given at the time, or would that be something you're asking us to add to this doctrine? Well, Your Honor, the court's decisions in Shorter and Chess say that there has to be sufficient evidence connecting the decision to a security-based policy. And this court's decision during the interlocutory appeal on qualified immunity made it very clear that there was no security-based policy as the rationale that was given at the time. So they would have to overcome kind of the record that shows no reference to security-based policy and say, yes, that was actually our decision. And I think it's also important to note that the testimony given was just that there are general security concerns related to protective custody. No one testified, yes, my actual reason for denying his protective custody request was because of my security-based concerns or because of this security policy. They just mentioned that was kind of a general consideration in the protective policy that was documented in the record in any way. Well, let me ask you if you wouldn't mind, who decides, who makes the decision? Well, there's a series of appeal levels, Your Honor, and so the first individual is the deputy warden, and so we have... I mean at our level. Oh, in the courts, Your Honor? Yeah, what do we look to? Who makes the decision that we review? Well, Your Honor, it was the district court's decision on whether to give the jury instruction. And was it left to the jury to do it? The jury was given the instruction, but according to this court's decision in Shorter, it emphasizes the prejudicial effect of such an erroneous instruction. It says that it essentially commands a verdict in favor of the defendants when it's improperly given. So it's a question of law about whether you should give the jury instruction in the first place, not a question about whether the jury followed that instruction. Well, it's clear, isn't it, that the jury is the one that's going to make that decision? The jury will make the ultimate decision on the facts, Your Honor, of course, but the question of what instruction should be given to the jury is a question for the court, and this court has very difficult to show harmlessness. I think I would have been helped if you had cited the costume case to us, and neither side cited that in their briefs. And I just wondered if you were aware of that and how it would fit into our decision on this case. Sorry, I'm not sure I caught the name of the case, Your Honor, referenced. It's costume, C-O-S-T-O-N, versus, I'll spell it for you, N-A-N-G-D-A-M-A. And none of the briefs have cited that case. I would think it would be helpful to us, perhaps. It's a 2021 case. I believe it's from after your briefing, but you could have submitted a letter. I'm happy to submit a letter if the court would like to, Your Honor, but we think that the shorter case is the most directly on point because it discusses specifically the instances in which this kind of instruction should be given. It also discusses the prejudicial effects of that instruction, so I think that that is the most, you know, on point case that we were aware of, but I'm happy to follow up with a short letter if the court would prefer us to. Well, it may be you have to go back and redo the trial, depending on what this case is. But we'll have to move for that. Maybe one of your colleagues also knows about this case, because you do a lot of work in this area, and maybe one of your colleagues can help when they have a chance to speak to us. I know you wanted to reserve time, but Judge Lasnik, were you about to ask something? I just was going to ask about if there was evidence to support the giving of the jury instruction, but you're saying that evidence is sort of manufactured by the witnesses and shouldn't have been given any credence? Well, Your Honor, I think that it's important to know the evidence was that what the witnesses said was that they would look at the inmate's file and they would consider how they have to be very judicious about who gets protective custody. And even Deputy Warden Schuster, who recommended protective custody, said that he'd only recommended it four or five times out of hundreds of cases that he's reviewed. So that's undisputed. But no witness testified that I denied Mr. Fioro protective custody because I was concerned about whether he would be safe with other protective custody inmates, or because we simply didn't have room in protective custody. So nobody testified to that. And so I think without that invocation, either at trial or in the contemporaneous record, you simply can't say that there was any security-based policy that was invoked in the decision-making process. Okay, thank you. Thank you. I'll reserve the remainder of my time. Thank you, counsel. So I'm not sure who's going first next. Yes, Your Honor. I'm Joe Diallo. I am, excuse me, Assistant Attorney General from Arizona. I'm representing all of the defendants except for Vukovic and Bauer. So, and I think we're splitting the time five minutes each. It's important to note, and it's very important to note, and I think it's easy to miss that the deference language was actually a part of the jury instruction at the time of trial. And prior to the district court giving the instructions to the jury, the court actually heard argument on this issue, on that language that was part of the jury instruction, the threat to safety jury instruction. He heard argument. He wrote a very well-reasoned, he deliberated on it. He wrote a well-reasoned order explaining why the deference language should be kept in the jury instruction. Are you familiar with the recent Costin case that Judge Wallace was asking about? I am not familiar with the Costin case, Your Honor. Okay, well, the Costin case is right on this point. It's about the jury instruction, and it says that if there's a dispute about whether the security risk was exaggerated, or whether it was really a valid decision based on the security concern, I'm paraphrasing, of course, then the instruction could be given, but with a further instruction that the jury should not give deference if they basically don't believe that it was a valid security concern because it was exaggerated. So it seems like that at least might be our situation here, where it's debatable whether this purported security concern was the real reason, was followed appropriately, whether the decision was validly based on it. Isn't that at least in dispute here? I don't think so, Your Honor. The protective custody is a very complicated, nuanced decision that has to be made at the deputy warden level and at the protective custody committee level. The department's policy is that not everybody gets to go into protective custody, only those inmates who actually face a statewide threat from basically a criminal threat from prison gangs. And isn't that what Mr. Fiero was claiming? Mr. Fiero was claiming that, but there was absolutely no evidence, and there was no evidence adduced at trial that he actually did face that kind of a threat. Mr. Schuster testified that there was some sort of confidential informant information, that there was a hit out on Mr. Fiero, but there was no documentation in the prison file, and Mr. Schuster even testified that he didn't document that, that nobody coming after Mr. Schuster could have known that there was any sort of statewide threat against Mr. Fiero. That's undisputed, that's uncontroverted in the record, in the testimony. Well, I don't, wait, how could, it's Schuster, right, is the officer who says he was under the threat? How can you say it's uncontested? I mean, the jury believed the other side, but there was testimony both ways. That's why it went to trial instead of having some re-judgment, and Schuster was on the other side. Because at trial, they, the other side, Mr. Fiero, Mr. Fiero's counsel, didn't put on any evidence, any actual objective evidence. Well, what was Schuster's testimony? Mr. Schuster's testimony was just that, I recommend a protective custody because there was a statewide threat. When asked, why isn't that evidence? I don't know. There was no confidential informant. Mr. Schuster testified that there was a confidential informant. His sergeant, who actually dealt with the confidential informants, testified at the end of trial that there was no confidential informant and there was no evidence in the file or in any of ADC's records that there was any kind of a statewide threat against Mr. Fiero. There was no hit, there was no confidential informant, and there was no evidence of a statewide threat. The only evidence was the threats that he was facing at the particular prison yards he was at. And some of that was just- You're saying that Schuster's testimony should be discounted and not considered, but that's a jury issue. I'm saying Mr. Schuster's testimony should not only be discounted, I'm saying that the testimony also established that there was no evidence. There was no evidence that these defendants could look to and find to conclude that there was a statewide threat against Mr. Fiero, so the subjective component of deliberate indifference wasn't met. And the jury concluded that. The jury necessarily concluded that. Or maybe the jury deferred to the prison because of the instruction. Okay. I don't think that's the case. I don't think that's the case because of the testimony evidence that was put on. Again, Your Honor, there was just no evidence that Mr. Fiero faced the kind of threat, no objective indicators that Mr. Fiero faced the kind of threat that would which they recommended, they being the defendants. We have you over your time, so I think we better go to Mr. Arndt. Thank you. Good afternoon, Your Honors. My name is Patrick Arndt. I represent defendants Zoran Vuksevic and Mr. Ryan Brower, who's a physician's assistant. I represent them on the claims of the appointment of counsel issue wasn't addressed in appellant's argument, so I'll just touch on that very briefly. I would just remark that the test is not whether Mr. Fiero would have done better with a lawyer or where it would have been easier for him to adduce facts with a lawyer, because if that were the case, every pro se litigant would qualify for the standard. The question is, was he able to present his arguments to the court? And I would just refer the court to any of the many motions and pleadings that Mr. Fiero made over the course of the marshalling evidence. He's referring to exhibits. He's referring to administrative policy within the Department of Corrections. He's citing to federal cases that apply to the facts, so he was able to represent himself and present these issues to the court. If we disagreed with you about that, would we have to vacate the medical claims because with a I don't think so, your honor, because at root, this is really a question of what amount of medication, what type of medication this gentleman should have gotten, and that's never going to be sufficient to state an eighth amendment claim. Perhaps if he had found an expert, he could have cited a medical malpractice claim. I think that's highly unlikely, but simple differences of medical opinion, particularly with regard to medication amounts and types, which is what we have here, he could have the best lawyer in the world and the best expert is never going to survive summary judgment. The medication issue, it's important to drill down on what he's alleging people did. In the second amended complaint, which is the operative complaint, there's no references to these back issues. There's no reference to the follow-up for back treatment. All it is is gabapentin and tramadol. I think there's one allegation that Mr. Brower should have followed up and gotten additional diagnostic testing, but that's it. The issue of who denied the additional back surgery is not either of my defendants. That's on page ER 396. That's the facility health administrator, and that's in Mr. Fierro's own allegations that the denial of surgery was not Fuchsiewicz. It wasn't Brower. It was somebody else. The medication decisions are based on medical judgment. Dr. Fuchsiewicz looks at the MRI, looks at this patient's history, and says he's on a thousand milligrams of gabapentin. That's a really high dose. It's a huge risk of abuse, huge risk of diversion, that sort of thing. It's also not approved by the FDA for the condition that he has, so Dr. Fuchsiewicz says, let's wean you off of this. Try to put you on different medications that'll help your pain but won't have these huge risks. Plaintiff didn't agree to try any of those back on. That's the entirety of the gabapentin decisions. The tramadol dose, again, he was getting 400 milligrams of tramadol. That's an opioid. He's got a history of using heroin. I mean, common sense says that's not a good idea to begin with, and that's before you get to the question of Mr. Fierro's liver condition. He's got hepatitis C. You're not supposed to go over 200 milligrams of this drug per day if you've got liver condition. That comes from the manufacturer of the medication. Again, Dr. Fuchsiewicz says, let's wean you off of that. Let's try other drugs. He went off of the formulary, which I'm sure you guys know if you're doing that in the prison, that's not the easiest thing to do. He went off the formulary to get Imelovil. Again, he's doing his best to treat the pain in a more safe way. Brouwer initially started seeing Mr. Fierro because of the issue of hardware in his hand, and that's something he'd been complaining about for a while. Brouwer goes and gets him x-rays, gets him a referral to a specialist, gets the hardware taken out. This is something that had been bothering him for a couple years. At some point, he asked Brouwer, he said, you think I could get a little bit more gabapentin? Brouwer says, I don't think that that's necessary, and so he says, well, now I want you to give me this additional diagnostic testing. There's no indication that the diagnostic testing or the back surgery was necessary, and that's according to the uncontested testimony of Fuchsiewicz and Brouwer. Appellant can't cite to a single case where a doctor or medical provider exercising his medical judgment, changing drug amount, changing drug type, stated a claim for the Eighth Amendment. I cited probably five or ten cases in my brief where the opposite result was found, is that if these guys are using their medical judgment and picking a different type of drug or different amount of drug, it's not an Eighth Amendment claim. I'll just say that you have to look at the treatment in the totality. They're working hard for this guy, they're doing their best, and there's no claim for deliberate indifference, particularly since it turned out Plaintiff wasn't even taking the gabapentin that he claimed to need so much. Could I take a little bit of my time? I know you went right to the clock and stopped for one second. I'm going to take a little bit more. We've been talking about this Colston case that nobody has been able to help us with so far, and it was not cited to us, but it indicates that perhaps this is a jury question. If that's true, would we have to vacate or remand and let you try this case to a jury? And I'm unfortunately going to have to join the crew and say I have not read that particular opinion. It would be against every bit of history in this circuit if they're now saying that a difference of medical opinion is a jury question. That's just not been the decisions of these courts. We cited several cases in the briefing that said just the opposite. In one case, a guy was on a particular medication. He was switched. He ended up dying, and the estate sued, and the court basically said, look, this is the medical judgment that he made. It's his right to do that, and it's not an Eighth Amendment claim. Again, it's Eighth Amendment. That case involves security problems, and I assume your answer would be that this does not fit. Yes, Your Honor, and I perhaps should have been clear about the fact that I am only the medical issue for Vuksevichs and Brower. They were not involved in any of the decisions regarding custody. I understand. I'm just picking your brain to get some ideas. Thank you. I don't want to build. You have some time for rebuttal. Thank you, Your Honor, and I'd like to start off by addressing the Coston case that Judge Wallace has asked about, and I apologize for not September. I think there's a couple of differences between this case and that case, which is why I don't think it's as on all fours as the cases we've cited. One is that there was an actual policy about morphine use in the prison that was at issue in that case, and here there's no actual policy being cited. What the court said was, and I think respectfully, it wasn't saying that this is ultimately a jury issue. It said that if the defendants are able to draw a connection to an actual policy, but it's disputed whether that policy is an overreaction to security concerns, and there's a conflict of fact about whether it's an overreaction or the security concerns are overblown, then the court can submit the instruction of the jury with the additional guidance that Judge Freeland mentioned. Here, there isn't any actual policy being cited, and so you don't even get past that first step. You're arguing for no instruction at all, but you'd be better off with the costed instruction than the instruction you got, right? Well, your honor, I think we would have to understand what the policy is that they are claiming to be relying upon. Is it just a policy that no one gets to be put in protective custody? That's clearly not the policy. Is it the policy that Mr. Fiera... There's no policy being cited that they claim to have been applying, so it's hard to say that it would be an overblown response to a security concern because we don't even know what the policy is. Here, they just said, we can't substantiate the threats against you. We have no reason to think that you need protective custody, and then if I just want to say one thing on the appointment issue that Mr. Arndt brought up, I think the key issue here is that it was prejudicial to deny him appointment of counsel because he wasn't able to take any depositions when there was conflicting testimony between the officers, and he wasn't able to call the two experts that his eventually appointed trial counsel had located, even though there were still six months before trial. The court struck those experts as untimely because he didn't procure them until after counsel was appointed, so I think that's a key difference between this and maybe another case where someone's denied counsel earlier in the proceedings, unless the court has any further questions. Thank you all for the very helpful arguments, and this was another case in our pro bono program. Thank you very much for your service in this program. It's very helpful to us, and we really appreciate it, and the case is submitted. Thank you all. Thank you, Your Honor. Thank you.
judges: WALLACE, FRIEDLAND, Lasnik